[Civ. No. 6239.   Third Appellate District.—April 30, 1940.]

PLACERES de ORO COMPANY, Appellant, v. BERT CAR-
PENDER, Respondent.

Morrison, Hohfeld, Foerster, Shuman & Clark and C. W.
Pearson for Appellant.

Butler, Van Dyke & Harris and Henry S. Lyon for Respondent.

THOMPSON, J.—The plaintiff has appealed from a judgment which was rendered against it in a suit for damages for alleged fraud exercised by the defendant in the sale of a placer gold mine near Placerville in El Dorado County.

The defendant had owned the Carpender Placer Mine since 1904. He obtained it from his father, who had previously operated it to some extent. It consisted of a claim upon which there was a shaft three or four hundred feet in depth, at the bottom of which a tunnel extended easterly 2,200 feet to the property line. The tunnel also ran westerly from the shaft a distance of several hundred feet. The mine contained other lateral channels, gangways, crosscuts and drifts, from which, in addition to some breasted areas, the soil and gravel were conveyed to the surface and washed out in sluice boxes to extract its gold content. The mine followed the course of an ancient subterranean river channel called the "Blue Lead". The pay dirt was located several hundred feet beneath the surface of the earth. Above this ancient river bed there was overlaid substrata of gold-bearing gravel and soil which, by the action of water and volcanic upheavals in past ages, were deposited in and mingled with the soil of the Blue Lead Channel. That entire region had been extensively mined from early days. The extent to which Bert Carpender's father developed that mine does not appear. For a period of thirty-five years the defendant either personally operated the mine or he worked in and about it while it was leased to half a dozen other men.

The defendant dug an incline shaft to a depth of 400 feet and ran a cross-tunnel for exploration purposes, several hundred feet in length, hoisting the gravel therefrom and extracting the gold by washing it out in sluice boxes. He obtained only a comparatively small quantity of gold from his personal operations. In 1907 he leased the property to a miner by the name of Pearce, who worked it for about a year, extending the main tunnel and running three short crosscut channels from which he obtained a quantity of gold. In 1909 it was leased to Dodge Burtt, who made a survey and prepared maps of the mine. He took numerous samples from the tunnels and tested them for their gold content. He did

not extend the gangways nor conduct any real mining operations. In 1911 the property was leased to G. H. Hayes, who operated it actively for fifteen months. He sank another shaft to a depth of over a hundred feet and extended a tunnel 75 feet easterly therefrom, and another one westerly a similar distance. He also ran an irregular tunnel along the course of the Blue Lead vein a distance of over 900 feet, striking a gray-pay-gravel bench from which he extracted $40,000 in gold. The defendant worked in the mine with Mr. Hayes throughout the entire term for which it was leased, with the exception of two and a half months. In 1912 the mine was leased to a man by the name of Taylor. He operated it for about a year, exploring and extending somewhat the tunnels which had been previously opened by Hayes. The defendant also worked with him every day that the lessee conducted the mine. For several years the mine was not operated, during which periods of time it remained filled with water. In 1934 Mr. Carpender leased the mine to a stock company, which explored the tunnels, testing the soil and working therein for about six months. The defendant also worked in the mine with that stock company. He was familiar with all of the gangways, crosscuts and breasting of areas which were developed. In 1929 the mine was leased to The Burke Company, which opened a drift and crosscut from the incline shaft, breasting out certain small areas. Mr. Carpender worked in and about the mine for that company throughout its term of lease and knew all about the development under its management.

All of the foregoing information was related to the purchasers by the defendant.

The defendant was born in the vicinity of the mine in question, and, during his entire lifetime he lived at the mine or in Placerville, near by, where he was known and highly regarded by the entire community. Many miners in that vicinity also worked in the Carpender mine and were perfectly familiar with its operations, including all of the tunnels, drifts and cross-channels. Fred Stancil had worked in the mine for Mr. Carpender as superintendent and otherwise, for several years. He knew all about the history of the Blue Lead and the development and operations of that mine.

In the spring of 1936, Malcolm W. Moss, W. D. O'Brien and J. K. Gold interviewed the defendant on several occasions

about purchasing the mining property. Mr. O'Brien was a skilled and experienced mining engineer. Mr. Carpender testified that he fully and fairly explained to them in detail the history and development of the mine, referring to a map thereof in his possession, which he informed them did not depict all of the crosscuts and tunnels which had been developed. He told them of the various leases of the mine heretofore referred to and of the works which each one completed. He spoke of the driftings and breastings of certain areas. He told of the cessation of operations and of the floodings of the mine during several periods. He said to the proposed purchasers he would send Fred Stancil, a reliable mining employee of the defendant, through the mine with them for exploration purposes, and that he would permit them to make a thorough examination and take samples of soil for testing and assaying to determine its gold content. He told them they would find "most of these drifts open". Clearly that remark inferred they would find some of the tunnels filled with fallen earth and gravel. He told them "Fred could explain all about them". Mr. Carpender was sixty years of age. He was in the habit of running the hoist. He told the purchasers that since he was the only one who could operate the hoist, he would let Stancil go down into the mine with them for the reason that he knew "just as much about it". At least two of them, Messrs. Moss and O'Brien, visited the mine several times. Stancil accompanied them in a thorough examination of the entire underground works. No objections were offered to the character or extent of the information with which they were furnished. No criticism of the conditions observed in the mine was made. No further inquiry regarding blocked gangways or fallen dumps of gravel was made of Mr. Carpender. Apparently they were perfectly satisfied with the conditions and with the prospect of a successful operation of the mine.

May 14, 1936, the defendant gave the three men above mentioned an option to purchase the mine, together with a considerable quantity of machinery and equipment for the sum of $35,000, to be exercised on or before June 1, 1936. In the meantime they continued to examine and inquire regarding the mine, with the apparent result of entire satisfaction. The condition of the mine and the details of the transaction were discussed with the defendant several times. On June 1st,

they exercised the option and purchased the mine and machinery, paying Mr. Carpender therefor the sum of $35,000. The three purchasers conducted active operations of the enterprise as a mining partnership (secs. 2511–2513, Civ. Code), until February 20, 1937, at which date they organized a Nevada corporation to which they then transferred title to the property.

The mining operations were actively continued without substantial success until March 1, 1937. The plaintiff expended some $30,000, developing the mine. During that period of time they did not charge the defendant with fraud, concealment or misrepresentation with respect to the character or condition of the mine. They finally became discouraged and then asserted for the first time that they had discovered "old works", of which they had not been informed, indicating that they had been deceived into purchasing a mine which had been completely "worked out" and which was valueless. They abandoned the enterprise without informing the defendant of their intention in that regard until after the mine had filled with water, thus preventing him from locating and inspecting the alleged works of which they complained. They organized the plaintiff corporation, Placeres de Oro Company, to which they transferred title to the property and assigned their chose in action February 20, 1937. They then brought this suit for damages for alleged fraud, filing the complaint on July 29, 1937.

The gist of the allegations of fraud is found in paragraph VI of the complaint. The pleading charges that the defendant represented to the purchasers of the mine that the Blue Channel was virgin soil which had never been mined for precious metals, except to wash out the gravel which had been necessarily removed from the visible tunnels and gangways, together with the gravel which had been obtained from small visible areas in a process of breasting the walls of the tunnels.

The cause was tried by the judge sitting without a jury. The court adopted findings to the effect that the purchasers of the mine examined it thoroughly before buying it; that they were granted the unrestricted privilege of exploring the mine and of procuring therefrom samples of earth or gravel for the purpose of assaying and testing them for their mineral value; that they were furnished a map of the underground

workings of the mine with the explanation that it was incomplete; that the defendant truthfully answered all questions propounded to him respecting the value and condition of the mine; that he made no false statements in that regard, and that he was not guilty of fraud in the sale of the mine. Judgment was thereupon rendered in favor of the defendant to the effect that plaintiff take nothing by its action.

We are of the opinion that, in spite of a serious conflict of evidence, there is ample testimony to adequately support the essential findings of the court and the judgment which was rendered. The trial judge is an experienced and careful jurist in mining litigation. The defendant was called by the plaintiff under the provisions of section 2055 of the Code of Civil Procedure and thoroughly examined. The record of his testimony consumes over 200 pages in the transcript. Four other miners testified in behalf of the defendant, corroborating him in many material respects. Mr. Stancil was not called as a witness. His absence was not accounted for. Mr. Carpender denied that he misrepresented the value or condition of the mine in any respect. On the contrary, he explained in great detail the shafts, the crosscuts, the tunnels, the drifts, and the breasting of areas which were developed and performed under each successive tenant, and by himself. He informed them that the mine had been flooded at intervals. Any experienced mining engineer ·should take notice that such flooded conditions as existed in this mine would be likely to loosen gravel and cause the caving of tunnels and drifts. The defendant said he thought he informed them that they "would find *most of the drifts* open". This warning inferred that they might find some of the tunnels filled with earth and gravel. This statement, together with the condition found to exist in the mine, should have indicated to a skilled mining engineer that accumulated gravel and debris in some of the tunnels and drifts might conceal evidence of former development. Carpender affirmatively denied that he told the purchasers none of the tunnels had been closed by fallen dirt or gravel, or that all of the former work of the mine was visible. The appellant does not claim that he made such statements to the purchasers. While there is evidence on the part of the appellant that the mine had been "worked out" and "gutted", the chief contention is that a portion of one tunnel, at a point some distance from its entrance, was

blocked by dirt and gravel concealing a continuation thereof which was not called to their attention before the mine was purchased. It is claimed that extensive breasting operations were conducted in other areas. It seems inconsistent that the defendant should have assured the purchasers that the entire mine was "virgin soil", with certain minor exceptions, in view of the fact that all the parties and everybody in the vicinity knew that extensive mining operations had been previously conducted therein for thirty-five years past. The defendant testified that he told them in detail all about the previous operations with reference to a map, which he informed them was not complete with respect to the depicting of certain tunnels and drifts thereon. It seems improbable that Mr. O'Brien could have been deceived into purchasing the mine with numerous visible tunnels and evidence of former extensive operations such as he found there.

The appellant insists that the defendant is bound by the failure of Fred Stancil, acting as his agent in examining the mine, to inform the purchasers of the hidden works concealed by accumulations of gravel and debris. That omission was testified to by several of plaintiff's witnesses. It is contended that evidence was uncontradicted and that the finding of an absence of fraud is therefore not supported by the record. We are of the opinion that conclusion is not warranted. It is true that Mr. Stancil was not called as a witness. ▮ But, assuming that he failed to disclose hidden works in the mine of which he had knowledge, that fact would not render the defendant liable for damages for fraud, since the purchasers had been thoroughly informed of conditions in the mine and the information was equally accessible to them. (12 Cal. Jur. 759, sec. 35.) There is adequate proof to support the finding that Carpender fully and fairly informed the purchasers of all the previous operations and works in the mine. Their attention was called to the fact that certain tunnels and drifts might have caved. In support of the judgment, there is, at least, substantial evidence that the purchasers were informed of possible concealed works, which should have placed them on notice and required of them further investigation and inquiry regarding the location and nature of the hidden operations. If it appeared there was a conflict between the statements of Fred Stancil and the defendant regarding the location of caved tunnels, further information on that sub-

ject should have been sought before the option to purchase the mine was exercised. The statement of Mr. Carpender that the mine had been flooded on several occasions and the presence of evidence of former extensive mining operations, including numerous caved walls and fallen dumps of earth, should have warned the purchasers that the obstructed tunnels might conceal excavations beyond the piles of dirt and gravel. The evidence of fraud and concealment was contradicted by the testimony of the defendant. The evidence on that issue was therefore conflicting. Under such circumstances we may not interfere with the judgment. Mr. Carpender was not asked to visit the mine after the alleged discovery of undisclosed works until the mine had been abandoned and was filled with water, so that he was prevented from observing the condition of which the purchasers complained.

The trial court was warranted in assuming that the mine was finally abandoned because it did not "pan out" as successfully as the purchasers hoped that it would. Gold mining is an uncertain venture. There is much truth in the proverbial saying that "gold is where it is found". The absence of gold in a purchased mine in paying quantity is not necessarily proof of fraud on the part of the vendor. Since the evidence in the present case is conflicting we are of the opinion this court is not warranted in interfering with the judgment.

It is contended the findings do not support the judgment, and that they are irreconcilably conflicting. We are of the opinion the findings are not defective or uncertain. On the contrary, we believe they may be reasonably reconciled in support of the judgment.

The challenged findings refer to consecutively numbered sections of the complaint. Each finding specifically determines the truth or falsity of every material allegation of each section of the complaint to which it refers. Some of the findings determine that a designated section of the complaint is either true or false in its entirety. Others find that particular sections of the complaint are untrue, with certain exceptions which are clearly referred to or quoted. There is no reasonable doubt regarding the court's determination of all material issues covered by the findings. That method of adopting findings has been approved, where the allegations of the pleadings to which they refer are reasonably certain

and clear in their meaning. (*Schomer* v. *R. L. Craig Co.*, 137 Cal. App. 620, 629 [31 Pac. (2d) 396].) Findings should be construed to uphold rather than to defeat a judgment. (*Ensele* v. *Jolley*, 188 Cal. 297, 303 [204 Pac. 1085]; 24 Cal. Jur. 989, sec. 215.)

We have carefully analyzed each of the challenged findings in the light of the asserted defects which are elaborately pointed out in the appellant's briefs. We are satisfied the findings are not uncertain or defective in any of the particulars assigned. The court determined every essential allegation of the complaint regarding the charge of fraud, and all of the incidental elements thereof, to be untrue. █ If a specific finding upon any allegation incident to the charge of fraud has been omitted, the appellant may not complain, for the adoption of further findings upon any of the issues of this case would be bound to be adverse to the appellant. Under such circumstances the failure to adopt more complete findings is not reversible error. (*Hulen* v. *Stuart*, 191 Cal. 562, 572 [217 Pac. 750]; 24 Cal. Jur. 499, sec. 188.)

The complaint is couched in sixteen consecutively numbered sections. The first four sections name the three individuals who constituted the original mining partnership, their association and purpose to purchase the property owned by the defendant, the name of the mine and its approximate location, the subsequent organization of the plaintiff corporation to which title to the property and chose in action were assigned for the purpose of suit. The last three sections of the complaint describe the mining property in detail, and allege its character and asserted value, together with the various sums of money expended by the purchasers in operating the mine, declaring that no part of the purchase price of the property or money expended in operating it had been repaid to plaintiff, and then declare the assignment of the cause of action and transfer of the property was made to plaintiff. All of the allegations of these seven sections of the complaint were found to be true. Certainly the appellant may not complain of those favorable determinations. Finding number IV inadvertently refers to paragraph number VIII of the complaint. Reference to the context of the last-mentioned finding as compared with the language of the complaint indicates beyond a doubt that it refers to paragraph VII of the complaint. That mistake is harmless. Findings numbers

VII and IX determine that all of the allegations of sections X and XII of the complaint are untrue. Each of the remaining findings quotes portions of specifically designated paragraphs of the complaint, which are asserted to be true. There is no uncertainty as to any such allegations found to be true. In each of these last-mentioned findings, after specifically designating the allegations found to be true, the court definitely determines that all of the other allegations of those sections of the complaint are untrue. The findings were drawn with meticulous care.

We are satisfied the court was very specific in the adoption of its findings; that all material issues have been determined by the court; that the findings are neither ambiguous nor uncertain, and that they fully support the judgment.

For the foregoing reasons the judgment is affirmed.

Tuttle, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 29, 1940.